[Cite as *Bechtel v. Turner*, 2020-Ohio-4078.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Nicholas Cameron Bechtel, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 19AP-686 |
| v. | : | (C.P.C. No. 18CV-7284) |
| John M. Turner et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on August 13, 2020

**On brief:** *Graff and McGovern, LPA,* and *Luther L. Liggett, Jr.,* for appellant. **Argued:** *Luther L. Liggett, Jr.*

**On brief:** *Vargo Law LLC,* and *James G. Vargo*; *James A. Zitesman,* for appellees John M. and Katherine K. Turner. **Argued:** *James G. Vargo.*

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} When a prospective house purchaser is told, among other things: that the home he wishes to buy has "unsatisfactory" "basement water penetration"/water "collection issues" of the sort that can be "lessened" by addressing such matters as the "grade and sloping of patios, porches, walks and driveways toward the structure," and that a "properly graded ground slope around the house" needs to be maintained; that basement water pipe connections are "corroded" and that wood floors in the kitchen are "cupping"; that "[w]ater [is] entering in at the garage area basement below and the metal support beams under the garage floor are rusted"; that "[v]ery unique water issues" "do need [to be] resolved"; and that the seller has been in communication with the city "a few times" about "surface storm water" and the city is "going to study the storm flow on the street to

determine placements of rain gardens, etc.,"—then is the buyer sufficiently on notice of major surface water issues relating to the property such that he cannot later advance claims that water issues were concealed or that he therefore got something other than what he bargained for?

{¶ 2} Because on the record of this case we agree with the trial court that the answer is "yes" as a matter of law, we will affirm the trial court's grant of summary judgment for defendant-appellee sellers John and Katherine Turner on plaintiff-appellant purchaser Nicholas Bechtel's claims for fraud and breach of contract regarding the allegedly undisclosed water issues. Because a genuine issue of material fact remains, however, as to whether the Turners fulfilled a written obligation regarding certain specified basement fixes, we will reverse the summary judgment against Mr. Bechtel only to the extent of that discrete contract claim.

{¶ 3} Many of the essential facts of this case are undisputed. The Turners, represented by a realtor, listed their Weber Avenue home for sale in April of 2018. The home sits below the street grade and is built into a steep slope that falls toward a ravine. Bechtel Depo. at 20-21; Bechtel Depo. Ex. 28 at 1; Ex. 35 at 1. So situated, the driveway slopes toward the first floor of the home, which includes a garage, kitchen, dining room, living room, and a half bath. Bechtel Depo. at 20-21; Ex. 2 at 2; Ex. 28 at 1; Ex. 35 at 1-2. Underneath the first floor sits a basement with a recreation room, a family room, and an unfinished room; because of the slope of the property, the basement is below the ground at the front of the home but at ground-level at the back of the home. Bechtel Depo. at 20-21; Ex. 2 at 2. A second story to the home includes bedrooms and bathrooms. Ex. 2 at 2.

{¶ 4} After he had toured the house, Mr. Bechtel on April 20, 2018 submitted a real estate purchase contract through his own realtor. Bechtel Depo. at 13, 16-17. The purchase contract stated that Mr. Bechtel would rely on his own examinations and inspections in assessing the condition of the property. Ex. 1, Section 14.6. The purchase contract at that stage also permitted the buyer to request repairs to unsatisfactory conditions or to terminate the contract, and to make a final verification that agreed-to repairs were complete before closing. Ex. 1, Sections 6.4(b) and 15.2. The buyer also had the option to waive any unsatisfied written contingency before closing, and the parties could extend the closing by written agreement. Ex. 1, Sections 12.3 and 15.1.

{¶ 5}  The Turners replied with a counteroffer and provided Mr. Bechtel with a

Residential Property Disclosure Form ("RPDF") in which their disclosures included:

> C) ROOF: Do you know of any previous or current leaks or other material problems with the roof or rain gutters? _√_Yes ___No.  If "Yes", please describe and indicate any repairs completed (not longer than the past 5 years): Downspouts *became* blocked, resulting in water in basement. Repaired in January, but advise ongoing monitoring. [Emphasis of past tense added.]
>
> D) WATER INTRUSION: Do you know of any previous or current water leakage, water accumulation, excess moisture or other defects to the property, including but not limited to any area below grade, basement or crawl space? _√_Yes ___No. If "Yes", please describe and indicate any repairs completed: Outside drain *becomes* blocked and was repaired in January. Drain needs to be monitored for blockage. Some water seepage in basement below hose bibs. [Emphasis of current tense added.]
>
> Do you know of any water or moisture related damage to floors, walls or ceilings as a result of flooding; moisture seepage; moisture condensation; ice damning; sewer overflow/backup; or leaking pipes, plumbing fixtures, or appliances? _√_Yes ___No.  If "Yes", please describe and indicate any repairs completed: Seepage from chimney resulted in discoloration in 3rd bedroom ceiling. Chimney company will repair gaps in masonry. Some water damage from window failure, windows replaced.
>
> * * *
>
> E) STRUCTURAL COMPONENTS (FOUNDATION, BASEMENT/CRAWL SPACE, FLOORS, INTERIOR AND EXTERIOR WALLS): Do you know of any previous or current movement, shifting, deterioration, material cracks/settling (other than visible minor cracks or blemishes) or other material problems with the foundation, basement/crawl space, floors, or interior/exterior walls? ___ Yes _√_No.  If "Yes", please describe and indicate any repairs, alterations or modifications to control the cause or effect of any problem identified (but not longer than the past 5 years): Visible cracks in basement, existed for several years.
>
> * * *

K) DRAINAGE/EROSION: Do you know of any previous or current flooding, drainage, settling or grading or erosion problems affecting the property? ___ Yes ____No. If "Yes", please describe and indicate any repairs, modifications or alterations to the property or other attempts to control any problems (but not longer than 5 years): In past, storm sewer inlet to the west of property has blocked resulting in water coming down driveway. Street is on City's Blueprint schedule (assess sewer system, rain gardens, sump pumps).

* * *

N) OTHER KNOWN MATERIAL DEFECTS: The following are other known material defects in or on the property: none

For purposes of this section, material defects would include any non-observable physical condition existing on the property that could be dangerous to anyone occupying the property or any non-observable physical condition that could inhibit a person's use of the property.

Ex. 5 at 2-4. Even though no box was checked in Section K, Mr. Bechtel agreed he "understood this to be a yes" based on the Turners' written response in that section. Bechtel Depo. at 25.

{¶ 6} The Turners' disclosures were enough to prompt Mr. Bechtel's realtor to inquire further about the sewer and water issues. In an April 21, 2018 e-mail, she asked the Turners' realtor for information about the location of the sewer line, the volume of water coming from the street, the result of the water coming in, the cost to clean the sewer line, information obtained about the sewer assessment, and costs of repairs and requirements to eliminate the problem. Ex. 6 at 3. She noted that the disclosures provided by the Turners did not say the problem was fixed. *Id.* Before receiving a response, Mr. Bechtel accepted the Turners' counter-offer subject to the other terms and conditions in the purchase offer. Ex. 4.

{¶ 7} Later that day, the Turners' realtor replied to Mr. Bechtel's realtor's e-mail, stating that "during heavy rains the storm sewers tend to get full and overflow into yards, driveways. There is a drain installed in the driveway at Weber Rd. that needs to be kept clear of leaves to function properly." Ex. 6 at 2. She also noted that the city was working its

way south as a part of a stormwater mitigation project called "Blueprint," and she provided a link to information on the city project. *Id.*

{¶ 8} John Turner, who was copied on the e-mail exchange, added:

> To clarify about the storm sewer: the issue is with surface storm water, not with the sanitary line. Rain water flows down the street into an inlet that diverts it to the ravine (the inlet is on the north side of Weber Rd, west of the house). The inlet can get clogged with debris during heavy rains, creating a back up, diverting water down the driveway. The drain in the driveway can then become clogged, causing water to pool and sometimes come into the garage and unfinished basement (no standing water in basement, but dripping).
>
> I've called the City 311 a few times and each time they send someone out to clean out the storm sewer/inlet. This solves the problem until the inlet gets clogged again. I spoke to a Blueprint program coordinator, and he indicated that my house is a candidate for improvements including: lining the sanitary line (to stop potential storm water flow into the sanitary system), sump pump, and roof water redirecting. They are going to study the storm flow on the street to determine placements of rain gardens, etc.
>
> In January, I hired a drain contractor who looked at the issue and put a camera into the driveway drain. He discovered the two downspouts next to the garage were completely clogged and the underground line had detached at one of the connections. He detached and cleaned out the downspouts and fixed the line (attached receipt). Since then, there has been no water in the basement, including during the heavy rains in March.

*Id.* at 1.

{¶ 9} Mr. Bechtel did not take any further action or request more information regarding the information disclosed by John Turner's e-mail as to water coming down the driveway. Bechtel Depo. at 33-34, 146. He made no inquiry of the city, and no further inquiry of the Turners.

{¶ 10} Mr. Bechtel did, however, hire his own inspector to conduct a whole home scan. He received the report from the inspector on about April 30, 2018. Bechtel Depo. at 34-36. Among other matters, the lengthy report emphasized problems with "Basement

Water Penetration" and "Basement Framing." Ex. 7 at 6. It noted as "unsatisfactory" conditions:

> *  the driveway because the "drain in front of the garage does not appear to be collecting all the water draining toward it";
>
> *  visible rot at the screened porch;
>
> *  cupping of wood floors in the kitchen;
>
> *  water stains at front entry closet walls and ceiling, perhaps suggesting a past gutter issue;
>
> *  basement water penetration, observing "damp now" and remarking, "[w]ater entering in at the garage area basement below and the metal support beams under the garage floor are rusted and one lag at the south L beam is missing. The south L beam may need [to be] replaced and the water issues do need [to be] resolved. Ask for drawing and warranty on the garage floor work and support system. Very unique and corrosion has affected its structural integrity";
>
> *  "[s]tains at furnace area south wall from minor seepage and dampness";
>
> *  metal sub decking and beams at the basement/garage area "corroded from active leaking" that "needs [to be] check[ed] for structural integrity and some possible replacement and [the] water issues [to be] resolved";
>
> *  corroded and leaking interior galvanized and copper water pipe connections at the south basement wall southwest of the furnace;
>
> *  rot at the basement floor joist end and framing atop the south block wall southwest of the furnace area; and
>
> *  a corroded electrical outlet in the basement.

*Id.* at 2-4, 6, 8, 11, 20-21, 24, 30; clearer copies at Ex. 7A and 7B.  With regard to the "unsatisfactory" "Basement Water Penetration," Mr. Bechtel's inspection report further recited: "Most water penetrations can be lessened by addressing collection issues such as gutter systems, grade and sloping of patios, porches, walks, and driveways toward structure."  Ex. 7 at 6, 20; Ex. 7B. It also listed, as "maintenance" or "normal" issues, minor

visible basement cracks that should be sealed and monitored for movement, and stained carpets at basement stairs; regarding the slab floor, it suggested that Mr. Bechtel "[a]sk for structural letter about the garage floor structure and the corrosion there for safety." Ex. 7 at 4, 6, 9, 20, 32; Ex. 7A and 7B.

{¶ 11} Mr. Bechtel did not review the home scan report with the inspector. Bechtel Depo. at 42. He did not ask any questions of the inspector, and, apart from the basement structural report discussed below, did not solicit or receive further opinion before consummating the deal. Bechtel Depo. at 42, 44. Instead, he reviewed the report with his realtor and formulated a list of requests for the Turners to remedy. Bechtel Depo. at 42-44. His first request to remedy asked the Turners, among other things, to: "provide current structural certification satisfactory to the Buyer (if they have one) and/or secure a new one and make any necessary repairs stated satisfactory to Buyer and provide a structural certification after work is complete"; have the structural engineer also review metal sub decking and beams for integrity; fix the rotted floor joist end and framing atop the south block; and fix the leaking galvanized and copper pipes at the basement south wall. Ex. 11.

{¶ 12} The Turners arranged for a structural engineering company, Nick Sung Engineering, Inc., to inspect and provide a report on the structural elements of the basement. Ex. 12. The report noted that the "front wall" of the "large basement room under the garage" "has cracked and bowed into the house." *Id.* at 1.

> In general, this type of inward movement is caused by exterior hydrostatic pressure due to poor drainage. The wetter the soil, the greater the pressure which tends to push the walls in towards the basement. Therefore, the best way to maintain the structural integrity of the walls is to maintain good drainage around the exterior. This involves maintaining a clean and functional gutter/downspout/drain system as well as maintaining a properly graded ground slope around the house. You recently cleaned and repaired the downspout drains that greatly reduced the amount of seepage into this basement. It is most important that these drains are kept in good working order.

*Id.* at 1-2. Regarding specific basement fixes, and for house-specific reasons, Mr. Sung did not recommend the typical "I-beams" remedy; rather, he recommended that the wall be reinforced by two "Helical Wall Anchors" that the report illustrated. *Id.* at 1. The report also recommended adding "an additional attachment bolt" to "the middle steel angle" in

the front of the room, and to "add a steel angle" under three rotted floor joists ("[f]our (4) 1/2" bolts should be used to attach the new steel angle to the foundation wall"). *Id.* at 2.

{¶ 13} Based on the Sung engineering report and also addressing other matters, Mr. Bechtel submitted a second request to remedy unsatisfactory conditions. He asked the Turners to make certain fixes, including that they make "repairs to structure as described and outlined in the Structural Report provided by Nick Sung and provide a structural certification upon completion." Ex. 13. The Turners responded that they would by closing remedy or pay contractors for five issues. Ex. 14 (adding that they would "have the requests noted completed with [certain] provisions" to be made "[i]n the interest of time and to expedite the closing"). They listed first: "1. Structural items: Seller will obtain a bid from a licensed contractor and will *cut a check to the contractor at closing to fund repairs*. Seller will also arrange for Nick Sung to *revisit property after repair and provide the certification.*" (Emphasis added.) *Id.* The other promised remedies are not at issue in this case. Mr. Bechtel signed off on this plan; in his subsequent deposition, he said he anticipated that the basement structural repairs and certification would be completed before closing. Ex. 14; Bechtel Depo. at 56-57.

{¶ 14} For the repairs indicated in the Sung engineering report, the Turners got an estimate from an outfit called Safe Basements of Ohio totaling $1,740. Ex. 15. They paid half of that amount ($870) up front. Turner Aff. Ex. 15 (specifying that the contemplated work was to install two wall anchors and a steel angle pursuant to the "engineer drawing[s]" provided by the Turners, and to install one new bolt "as indicated on engineer specifications," and noting that a city permit would be required as based on "an engineer drawing"). That work was not done before closing. Bechtel Depo. at 63. Mr. Bechtel did not communicate with another contractor or get his own estimate because "the request for remedy [had] asked [the Turners to do it], and [Mr. Bechtel] didn't have access to the home yet." Bechtel Depo. at 57.

{¶ 15} On the day of the closing, May 22, 2018, Mr. Bechtel received from the real estate title company a check made out to Safe Basements for the $870 invoice balance; the plan was that he would pay the basement contractor once the work was complete. Bechtel Depo. at 65-66, 68-69, 78. The check to Safe Basements was noted in the settlement statement. Ex. 19; Bechtel Depo. at 75-76. The basement work had not yet begun, and Mr.

Bechtel later testified that "we were given information from my Realtor, from the other Realtor to the Turners that it was going to be taken care of immediately, and that they had a contractor on board to do it, but there was a delay in getting some of the materials needed to do it." Bechtel Depo. at 67. Viewing the specified repairs as an "$870.00 issue," and wanting to secure the house so that he could move in promptly, Mr. Bechtel moved forward with the closing: "we were already under contract on selling the place we were currently living in, so there was probably the issue of having to get out of one and into the other." Bechtel Depo. at 67, 145-46.

{¶ 16} The record on summary judgment suggests that on May 23, 2018, the day after the May 22 closing, Mr. Bechtel's real estate agent forwarded to him an e-mail Mr. Turner had sent late in the afternoon of May 22 reporting that Safe Basements was having to "move the date of the work to Friday" (May 25) because of a delay in procuring parts. Ex. 21 at 1. But Safe Basements did not return to the property, nor did it respond to calls from Mr. Bechtel. Bechtel Depo. at 91-92; Ex. 23 at 2. On June 13, 2018, Mr. Bechtel's realtor asked if Mr. Turner "could intercede on their behalf to make sure this project is successfully completed." Ex. 23 at 2. Mr. Turner responded that he would "try to contact them" and the next day reported to both realtors that he had called and learned that there was "an issue with the anchors," but that the company president had not called back as promised. *Id.* at 1.

{¶ 17} The record also contains June 19 correspondence in which Mr. Turner wrote Mr. Bechtel: "I wanted to give an update on what I have been doing to resolve the basement work." Ex. 24 at 1. With Safe Basements exploring an alternative approach that Nick Sung had not specified, Mr. Turner reported that he had "been calling other contractors" and soliciting other bids based on the Sung report. *Id.* at 2. "I am sorry Safe Basements is not doing what they agreed to do and I will work to resolve this as quickly as I can," he added. *Id.*; *see also* Ex. 25 (Turner communication with another contractor regarding work "to install helical anchors on a basement wall."). *Compare* Appellees' Brief at 41 (arguments by the Turners as based on post-closing efforts; they "made substantial efforts after closing to have the contractor [Safe Basements] * * * complete the work"). Some evidence suggests that those efforts by the Turners extended into August 2018. *See* Ex. 27 (containing August 23, 2018 e-mail from Mr. Turner discussing a contractor). Mr. Bechtel testified at

his deposition that one contractor with whom Mr. Turner had been in touch provided "a quote of approximately $8,045" for work "limited to the basement issue underneath the garage." Bechtel Depo. at 103-04; Ex. 28 at 2.

{¶ 18} To the extent reflected by the record, no contractor ever completed the work identified in the Sung engineering report. Bechtel Depo. at 66, 69, 81-82, 91-92. It was not possible, therefore, for Nick Sung ever to "revisit [the] property after repair" and provide his "certification" that the repairs were up to the specifications he required. *See* Ex. 14 (Seller's Response to Buyer's Request to Remedy). The record also carries a suggestion that the check to Safe Basements for the Sung-indicated basement repairs grew stale and expired. Ex. 32.

{¶ 19} But Mr. Bechtel's concerns went far beyond the unremedied basement room. In June 2018, by his account, the property flooded: stormwater flowed down Weber Road, over the curb, down the driveway, and into the home where it entered the kitchen and basement. Bechtel Depo. at 86. The city responded to Mr. Bechtel's "311" request and indicated to Mr. Bechtel that the street storm sewers were open and flowing. Bechtel Depo. at 82-83. But even when the catch basin in front of the garage door was not clogged, about two feet high of water still built up against the garage doors. Bechtel Depo. at 137.

{¶ 20} Mr. Bechtel asked other contractors to review the issue with the water flow from the street coming over the curb. Ultimately, according to Mr. Bechtel, it was determined that work associated with the curb area is not within his power because the area lies within the city right-of-way. Bechtel Depo. at 98-100. The one remaining possibility for remedying the water issue involved removing a 2-foot-wide swatch of the driveway and front yard and installing a one-to-two-foot-deep French drain along the front of his property into the city storm sewer. Bechtel Depo. at 137.

{¶ 21} On August 28, 2018, Mr. Bechtel sued the Turners, initially alleging one count of "fraudulent concealment and misrepresentation" and one count of breach of contract. Complaint at 4. The fraudulent concealment and misrepresentation count claimed that the Turners, before closing on the sale, knew of (and had complained to the city) that the premises experienced "severe flooding [due to conditions] which had not been repaired," but "concealed their personal knowledge of the true condition of the [p]remises flooding, misrepresenting the material nature of the flooding, [and] misrepresented that all

defective conditions were repaired, while failing to disclose the continued condition." Aug. 28, 2018 Complaint at 4-6. Mr. Bechtel also alleged the Turners had breached their contract with him because the "[p]remises sold are materially defective from the condition represented in the Real Estate Purchase Contract and [RPDF][.]" Aug. 28, 2018 Complaint at 6-7. Mr. Bechtel asked for rescission of the contract or in the alternative for damages, as well as for punitive damages, attorney fees, and prejudgment interest.

{¶ 22} The Turners filed a motion for summary judgment on June 4, 2019. They argued that the doctrine of caveat emptor prevents the claims regarding water problems at the property because: Mr. Bechtel had an unimpeded opportunity to examine the property; the water problems at the property were discoverable upon a reasonable inspection and were in fact identified by his inspector as well as having been disclosed by the Turners; and Mr. Bechtel could not justifiably have relied on any insufficient disclosure given the overwhelming evidence of water problems at the property. Regarding breach of contract, the Turners asserted that summary judgment is appropriate because no representations regarding the condition of the property were made, and the contract advises the buyer to have an inspection and specifies that the buyer is to rely on the inspection to gauge the condition of the property. Further, the Turners asserted that Mr. Bechtel failed to establish a breach of contract based on the language of the agreement to remedy and his waiver of claims.

{¶ 23} Mr. Bechtel's counsel then filed a "praecipe to file video plaintiff's memo contra defendant's motion for summary judgment" on June 26, 2019, seeking to have the clerk file "two videos contained on the disc hand-delivered to the Clerk with this Praecipe." Praecipe at 1. On June 28, 2019, Mr. Bechtel filed an amended complaint and a memorandum opposing summary judgment.

{¶ 24} The amended complaint added facts and allegations related to the failure of the contractor to complete the structural repairs in the basement, and also recited that the Turners had communicated with the city in May and July 2017 to report:

> During heavy rains, such as 5/21, the storm sewers become overwhelmed and a large volume of water goes down my driveway into my property toward Walhalla Ravine. My driveway and front patio become a river of water that goes around the house and into the ravine. Caused by a failure of the

storm system and the slope of the street toward my property which is below the ROW grade. I have videos and pictures.

* * *

[A]ttached is a video showing the flooding from earlier this summer. As we discussed, in heavy downpours, the water overwhelms the stormwater system, flowing onto my property in a large volume taking the shortest path to Walhalla Ravine. Since the event shown on the video, the flooding has occurred at least 3 additional times. This is an ongoing issue for several years, I have pictures and video going back to 2012.

June 28, 2019 Amended Complaint at 1-2. The amended complaint characterized the referenced video as depicting "a torrent of water covering the entire premises, a rush of flooding down the house steps and across the lot, covering all land and surrounding the house as though located in the middle of a running river or lake." *Id.* at 2. Mr. Bechtel asserted that the Turners "never informed him of the existence of this 'volume of water[,]' or videos and pictures 'going back to 2012,' which Bechtel since obtained in this litigation's discovery" and had not disclosed "the material nature that the [p]remises 'are below street grade' and is a 'private property grade issue' causing the [p]remises flooding, which did <u>not</u> relate to blockage, nor had been repaired." *Id.* at 2, 6.

{¶ 25} The amended complaint asserted three counts: "Breach of Contract – Rescission" based on the Turners' alleged failure to disclose the complete and "material nature of the flooding" and alleged misrepresentions of "all defective conditions including the [b]asement as though they were repaired"; "Breach of Contract – Money Damages" based on the premises as sold being "materially defective from the condition represented in the Real Estate Purchase Contract and Disclosure Form," with injury caused by "damage to the basement" and "as a result of severe flooding"; and "Tort – Fraud" based on the Turners' alleged failure to disclose "the true nature of the flooding[.]" *Id.* at 8, 11.

{¶ 26} In his memorandum opposing summary judgment, Mr. Bechtel argued that the motion should be deemed moot or premature because of the amended complaint and the amended case schedule. Alternatively, he argued that summary judgment was precluded by material issues of fact, including "whether a reasonable person might view the Turners' limited disclosures and affirmative concealment of the videos as [having been]

made in their self-interest of unloading this [flooding] problem on an unsuspecting buyer." Memo. Contra at 10.

{¶ 27} Following the back and forth on summary judgment, Mr. Bechtel filed what he styled a "motion in limine" asking the court to "find that the two videos filed of record June 26, 2019 are true and accurate copies of the videos provided by Defendants Turner in their discovery production." July 23, 2019 Motion in Limine at 1. The motion took issue with the Turners' refusal to authenticate the videos. The Turners opposed the motion in limine, noting that Mr. Bechtel had attempted to direct the clerk to file "two videos" without an accompanying affidavit or information about what was filed, that there is no basis under the rules of civil procedure or the rules of evidence for a court itself to authenticate the videos, and that Mr. Bechtel had numerous avenues under the rules by which he might have authenticated the videos. August 4, 2019 Memo. in Opp. at 2-3.

{¶ 28} The trial court granted the Turners' motion for summary judgment. On the way to doing so, the trial court found that the amended complaint had not nullified the motion for summary judgment because the motion for summary judgment addressed not only the claims of the original complaint but also anticipated all the claims of the amended complaint. On the merits of the summary judgment motion on the fraud claim, the trial court found that the Turners had disclosed the flooding, and that in any event the undisputed facts showed that Mr. Bechtel could not claim the necessary element of justifiable reliance regarding any alleged misrepresentation because he had notice of significant water issues from Mr. Turner's e-mail and from his own inspection: "Plaintiff's own inspector provided Plaintiff with substantial evidence of water problems and designated them as 'need repair.' Clearly, Plaintiff had notice of the Property's water problems and did not justifiably rely on any alleged misrepresentation * * *, so there can be no fraudulent misrepresentation." Decision at 12. The trial court further found that under the language of the real estate purchase contract, Mr. Bechtel when he "closed on the sale * * * accepted the condition of the property and waived any claim he may have had for breach of contract relating to flooding and structural problems in the basement." Decision at 13-14, citations omitted (noting that "even though he knew he could walk away from the sale because the [basement] repairs were not performed, Plaintiff still chose to close on the sale"). Having granted summary judgment to the Turners, the trial court found Mr.

Bechtel's "motion in limine" rendered moot as a pretrial motion in a case that was not proceeding to trial.

{¶ 29} Mr. Bechtel now appeals the trial court's judgment, raising a single assignment of error: "The trial court erred on summary judgment in a jury trial by weighing the evidence prior to concluding discovery, not merely determining judgment as a matter of law on undisputed facts." Appellant's Brief at V, 19.

{¶ 30} Appellate review of a summary judgment decision is "de novo, governed by the standard set forth in Civ.R. 56." *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 8. A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the party's pleadings, but * * * must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party." Civ.R. 56(E); *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Thus, under the rule, "[s]ummary judgment is appropriate when an examination of all relevant materials filed in the action reveals that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, ¶ 12, quoting Civ.R. 56. When applying the de novo standard, "the court of appeals independently reviews the record and affords no deference to the trial court's decision"; it examines the evidence of record in the light most favorable to the non-moving party. *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6, citing *Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9; *see also, e.g., Weinkauf v. Pena*, 10th Dist. No. 19AP-707, 2020-Ohio-3293, ¶ 3.

## A. Procedural issues

{¶ 31} Initially, we note that Mr. Bechtel challenges the trial court's decision to proceed on the motion for summary judgment despite the filing of an amended complaint, along with its handling of the "motion in limine" and videos said to depict flooding. Bechtel's Brief at 2-19. These arguments are not comprehended by the assignment of error. "This court rules on assignments of error, not mere arguments." *Huntington Natl. Bank v. Burda*, 10th Dist. No. 08AP-658, 2009-Ohio-1752, ¶ 21, citing App.R. 12(A)(1)(b) (stating that "a court of appeals shall * * * [d]etermine the appeal on its merits on the assignments of error set forth in the briefs"); *Williams v. Barrick*, 10th Dist. No. 08AP-133, 2008-Ohio-

4592, ¶ 28 (holding that appellate courts "rule[] on assignments of error only, and will not address mere arguments").

{¶ 32} Even were we to reach them, we would not find them meritorious.   " 'The Civil Rules do not provide that a pending motion for summary judgment is rendered void by the filing of an amended complaint.' " *Doe v. Skaggs*, 7th Dist. No. 18 BE 0005, 2018-Ohio-5402, ¶ 13, quoting *Conway v. Thermafab Alloy, Inc.*, 8th Dist. No. 98091, 2013-Ohio-1539, ¶ 34. The moving party has no duty to renew its motion for summary judgment, "at least in the absence of any amendment to the complaint that would affect the issues raised in the motion for summary judgment." *Conway* at ¶ 34, citing *Singer v. Fairborn*, 73 Ohio App.3d 809, 813 (2d Dist.1991).   Mr. Bechtel was free to try to argue against summary judgment with reference to allegations of his amended complaint, but the mere fact that he had filed an amended complaint did not negate the summary judgment motion or relieve him of his obligation to point to facts showing some genuine issue for trial.

{¶ 33} Similarly, even had the assignment raised claimed error in an evidentiary ruling, Mr. Bechtel's quarrel with the trial court's decision on the "motion in limine" still would fail. The trial court found the motion moot in light of the grant of summary judgment, and Mr. Bechtel offers no counterargument or legal authority contrary to this conclusion. Further, although it may have been easy enough to do through various approaches, Mr. Bechtel provided no certification compliant with Civil Rule 56(C) to show the provenance of the videotapes and how he got them.

{¶ 34} Mr. Bechtel's assignment of error instead challenges the appropriateness of the trial court's decision to grant summary judgment against his claims on the basis of the evidence before it.   We find, after a fresh review of the record and arguments, that the summary judgment was warranted in favor of the Turners on the fraud theory and on any contract theory extending beyond a claim for breach regarding a failure to obtain Nick Sung's engineering certification for the basement fixes he specified.

**B. Fraud**

{¶ 35} The doctrine of caveat emptor generally "governs the obligation of sellers of real property to disclose information to potential buyers and precludes any reliance on certain misrepresentations made by a seller or sellers concerning the condition of the property at issue." *Gentile v. Ristas*, 160 Ohio App.3d 765, 2005-Ohio-2197, ¶ 49 (10th

Dist.). "Under the doctrine of caveat emptor, a seller has an obligation to disclose only those defects known by the seller that could not be readily discoverable by a reasonable inspection." *Id.* at ¶ 50, citing *Layman v. Binns*, 35 Ohio St.3d 176, 177 (1988) (noting that "[a] seller of realty is not obligated to reveal all that he or she knows. A duty falls upon the purchaser to make inquiry and examination"). The doctrine of caveat emptor thus precludes recovery in an action by the purchaser for a defect in real estate where "(1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the vendor." *Cardi v. Gump*, 121 Ohio App.3d 16, 22 (8th Dist.1997).

{¶ 36} Mr. Bechtel claimed fraud. For that, he had to point to evidence that when viewed most favorably to him could show: (1) a representation or, when there is a duty to disclose, concealment of a fact, (2) material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance on the representation or concealment, and (6) an injury proximately caused by that reliance. *Cardi*; *Gentile*. Mr. Bechtel alleges that the Turners misled him by their responses in the RPDF and by otherwise failing to disclose the water problems and the nature of the flooding.

{¶ 37} The Turners moved for summary judgment on Mr. Bechtel's fraud claim on the basis that no genuine issue of material fact was in dispute and that they were entitled to judgment as a matter of law on the disclosures they provided and Mr. Bechtel's lack of justifiable reliance. As to the adequacy of the disclosures, the Turners cited their RPDF disclosures of water seepage in the basement, problems with the outside drain, and water coming down the driveway when the storm sewer gets blocked, and they also cited to the e-mails from their realtor and John Turner disclosing water overflow into the yard and driveway during heavy rains, the reoccurring nature of the problem, and Mr. Turner's repeated contacts with the city over the issue. As to the lack of justifiable reliance, the Turners pointed to Mr. Bechtel's own inspection report, which documented significant signs of water flow toward the home and water intrusion (including corrosion, structural problems from corrosion, rot, stains, and cupping of boards), expressly stated the need for

the water issues to be resolved, and discussed adjusting the grade of the walks and driveways toward the home as a way of alleviating water issues. The Turners further cited to Mr. Bechtel's deposition as evidence that he did not seek additional advice from his inspector or another professional regarding the water problems and did not act by making inquiry of the city or otherwise on the basis of the substantial information he had.

{¶ 38}  The Turners satisfied their initial *Dresher* burden. The burden then shifted to Mr. Bechtel, as the non-moving party, to provide specific facts showing the existence of a genuine triable issue on the elements of his fraud-based claim.

{¶ 39}  Construing the evidence of record in the light most favorable to Mr. Bechtel, we agree with the trial court that he did not point to facts showing a genuine issue for trial on the justifiable reliance element of his fraud claim. A buyer's reliance on a seller's alleged non-disclosure or false representation is not justifiable, as a matter of law, where undisputed evidence demonstrates that the buyer had other sufficient notice of the misrepresented or undisclosed issue before closing on the home. *Gentile* at ¶ 62-63.

{¶ 40} For example, a buyer's home inspection that documents signs of water intrusion or damage, such as dampness, a musty smell, seepage, stains, efflorescence, and the need for grading or drainage improvement, is generally sufficient to place a buyer on notice of potential water issues, the cause and scope of which the buyer is charged with exploring further. *See Gentile* at ¶ 63 (upholding summary judgment in favor of sellers on buyers' fraud claims where buyers could not have justifiably relied upon seller's alleged non-disclosures and misrepresentations of water problems in the basement since the home inspection and general observation of the basement placed appellants on notice of water damage). *See also, e.g., Ponder v. Culp*, 9th Dist. No. 28184, 2017-Ohio-168, ¶ 15 (affirming summary judgment in favor of sellers on buyers' fraud and fraudulent inducement claims where buyer could not justifiably have relied on sellers' alleged non-disclosures and misrepresentations;  inspector had informed buyers that water may leak into the house due to the slope of the driveway, and buyers failed to exercise their right to notify the sellers of their dissatisfaction and elected instead to purchase the property); *Bencivenni v. Dietz*, 11th Dist. No. 2012-L-127, 2013-Ohio-4549, ¶ 50, 54, 58-61 (summary judgment for seller proper where buyer could not show justifiable reliance on seller's "undisclosed pervasive water problem," as buyer's own home inspector noted water intrusion issues and buyer did

not make further investigation of cause); *Cardi*, 121 Ohio App.3d at 22-23 (seller entitled to summary judgment on fraud claim because buyer could not show justifiable reliance on seller's representations about cause of water leakage when inspection indicated that buyer should inquire into drainage system). Similarly, a buyer who is aware of water damage in the basement and has been alerted to potential flooding but who does not conduct a more thorough investigation of the issue cannot show justifiable reliance on the seller's representations and summary judgment in favor of the seller is appropriate. *Fleck v. Loss Realty Group*, 6th Dist. No. WD-10-011, 2011-Ohio-152, ¶ 23-24.

{¶ 41} In this case, it is undisputed that the property at issue sits below the right-of-way with a grade that slopes toward the house. Bechtel Depo. at 20-21; Ex. 28; Ex. 35. Mr. Bechtel signed a purchase contract agreeing that he would rely on his own examinations and inspections in assessing the condition of this property. Following the Turners' submission of the RPDF and e-mails, Mr. Bechtel had unimpeded access to the property, and hired an inspector to conduct a whole home inspection. Although Mr. Bechtel urges that the inspector never explicitly used the word "flooding" in his report and that the flooding was latent because it is observable only during rain, a review of the inspection report shows that Mr. Bechtel was informed of a range of "unsatisfactory conditions" indicating unresolved water flow toward the house and damaging water intrusion. Beyond pointing to myriad indicia of water problems, the inspection report mentioned perhaps adjusting the grade of the walks and driveways toward the home. And the report linked structural damage to potentially ongoing water intrusion: "Water entering in at the garage area basement below and the metal support beams under the garage floor are rusted * * * south L beam may need replaced and the water issues do need resolved. Ask for drawing and warranty on the garage floor work and support system. Very unique and corrosion has affected its structural integrity." Ex. 7 at 22; Ex. 7B at 1.

{¶ 42} Under these circumstances and as a matter of law, Mr. Bechtel could not justifiably have relied on the Turners' alleged non-disclosures and misrepresentations. Because no genuine issue as to any material fact remains on the element of justifiable reliance, and the Turners are entitled to judgment as a matter of law, the Turners were entitled to summary judgment on Mr. Bechtel's fraud claim.

### C. Breach of contract

{¶ 43} To prevail on his breach of contract claims for recission or damages, Mr. Bechtel had to prove: (1) the existence of a contract; (2) his performance under the contract; (3) breach by the Turners; and (4) damages he sustained. *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 18 (10th Dist.). In order to prove a breach by the defendant, a plaintiff must show that the defendant " 'did not perform one or more of the terms of a contract.' " *Id.*, quoting *Little Eagle Props. v. Ryan*, 10th Dist. No. 03AP-923, 2004-Ohio-3830, ¶ 15. Mr. Bechtel argues that the Turners did not sell him the property in the condition that he bargained for and was promised.

{¶ 44} With his amended complaint read most generously in light of the case's procedural posture, Mr. Bechtel can be understood to allege that the Turners breached their contract with him in two ways: (1) by not disclosing the severity of the water issues and thereby selling him a property materially deficient from that contemplated by the purchase contract as informed by and including the RPDF, and (2) by failing to make the basement fixes and provide the Nick Sung certification as arguably promised.

## 1. General water issues

{¶ 45} The Turners moved for summary judgment on his breach of contract claim related to disclosure of water problems at the property on the basis that the purchase contract did not contain representations of the condition of the property, specifically advised the buyer to conduct his own inspection, stated that the buyer is relying solely upon his own examination and inspection, and contained a merger clause indicating the purchase contract encompasses the entire agreement. The Turners also cited to Section 6 of the purchase contract. Those provisions permit the buyer to terminate the contract for unsatisfactory property conditions discovered through the inspection, but recites that failure to deliver written notice of such termination "CONSTITUTES ACCEPTANCE OF THE CONDITION OF THE PREMISES AND SHALL BE A WAIVER OF THE BUYER'S RIGHT TO TERMINATE." Purchase Contract at Section 6.4(b). Mr. Bechtel did not raise a counterargument in his memorandum opposing summary judgment, and the trial court determined the issue in the Turners' favor.

{¶ 46} We find that his contract claims as based on the water issues themselves fail for much the same reason his fraud claim does: he closed on the deal and accepted the property even in light of all the identified water problems. The much narrower issue of the

basement fixes as addressed in the Seller's Response to Buyer's Request to Remedy (with a check to the seller's selected contractor "at closing to fund the repairs" and the seller's further commitment to "arrange for Nick Sung to revisit property after repair and provide the certification"), however, presents a different matter. Ex. 14.

## 2. Certification of basement repairs

{¶ 47}   On that contract claim as related to the contemplated basement fixes and certification, the Turners moved for summary judgment under two rationales: they never breached their promises, they argued, and regardless, Mr. Bechtel waived this claim too under the contract.  In support of summary judgment, they pointed to the language of the purchase contract including the addendum detailing the agreement to remedy, Mr. Bechtel's deposition, Mr. Turner's affidavit, and the Sung engineering report. Mot. for Sum. Jgmt. at 15-18. Mr. Bechtel in his memorandum in opposition to summary judgment countered that "[g]iven the lack of [the structural] certification, the Turners must admit their breach of the agreed basement remedy." Memo in Opp. at 9. The trial court agreed with the Turners, finding that when Mr. Bechtel closed on the sale he had accepted the condition of the property and waived claims for breach of contract relating to both flooding and problems in the basement.

{¶ 48} Construed in the light most favorable to Mr. Bechtel, the record when considered as a whole presents a genuine issue of material fact as to whether the Turners breached an obligation that was not extinguished at closing to have the three specified basement fixes (installation of two helical wall anchors, an additional bolt, and an added steel angle) done to a level that would meet Nick Sung's "certification."

{¶ 49} The terms of the written agreement called for the Turners to fund those repairs with "a check to the contractor [of their choice] at closing," and "also [to] arrange for Nick Sung to revisit property after repair and provide the certification."  Ex. 14, Seller's Response to Buyer's Request to Remedy.  The contract specified no particular contractor to do the work, and specified no particular money amount for those repairs (and thus signaled no particular reason for Mr. Bechtel to care about the price tag, as opposed to the quality of work); correspondingly, Mr. Bechtel did not himself get any cash for that work, instead receiving only a check made out to the contractor the Turners had selected.  And while there may be some room for the parties to contest what the consequences would be for repair

work that did not merit the engineer's certification, the agreement's plain language provided that the engineer's "revisit" for certification would not occur until "after repair" was accomplished. Ex. 14.

{¶ 50} So—we emphasize—this is *not* a case in which the seller conveyed an agreed amount to the buyer at closing to cover (liquidated) future repair costs. Because the apparent facts of this case are not the norm, we reiterate: The parties did not agree on a set amount, but agreed rather that the Turners would pay an unspecified amount at closing in the form of a check to an unspecified contractor to do work, and that the Turners would arrange for certification of that work by the agreed-upon engineer. Under the facts as construed in the light most favorable to Mr. Bechtel, that work has not been done and the Turners have not provided for the required post-repair certification.

{¶ 51} In these particulars, this case rather parallels *Clark v. Humes*, 10th Dist. No. 06AP-1202, 2008-Ohio-640. We find our precedent there instructive. In that case, too, the sellers hired a structural engineer in order to respond to a buyer's "request to remedy" an "unsatisfactory condition" (there, of a sunroom); the engineer made certain recommendations; and the sellers agreed to remedy the issues according to those recommendations. *Id.* at ¶ 2-4. The sellers hired a contractor with the intent that he make the repairs before closing; the work was delayed; and money for the repairs was placed into an escrow account pursuant to an addendum reading: "Sellers agree to put $3000 in escrow at closing for the work to be done," with any remaining funds to be returned to the sellers. *Id.* at ¶ 5. The escrow agreement at closing reflected that the sum had been provided for that purpose. *Id.* at ¶ 6. At some point after the closing, the sellers' chosen contractor reported that he might not be able to do the job at all. *Id.* at ¶ 7. The sellers then solicited other estimates, but did not get the repairs done. *Id.* at ¶ 8. After the buyers spent more than the escrowed amount to achieve the repairs, they sued the sellers for breach of contract. *Id.* at ¶ 8-9.

{¶ 52} In affirming the trial court's judgment for plaintiffs on a paper record, this court found that the addendum agreement to remedy the sunroom " 'pursuant to the recommendations of the engineer' " specified "what repairs the [sellers] must pay for," and we rejected the sellers' argument that the addendum capped their liability at the escrowed $3,000 amount. *Id.* at ¶ 14, 16 (the "addendum merely ensures that at least $3,000 would

be available for the repairs; it does not set a maximum amount for which the [sellers] would be responsible"). We further observed: "the [buyers] assert that the [sellers] failed to perform their contractual duty. The [buyers] were aware of the condition of the sunroom, addressed the condition in the real estate purchase contract, and now seek a recovery based upon that contract. The doctrine of caveat emptor, which protects a seller from liability for misrepresentations, does not excuse the [sellers'] refusal to honor their contractual obligation." *Id.* at ¶ 19.

{¶ 53} In this case, not only did the Turners commit in the addendum to "cut a check to the contractor at closing to fund repairs," they additionally agreed "to arrange for Nick Sung to revisit property after repair and provide the certification." That appears not to have happened, and on this record and consistent with our holding in *Clark*, we cannot uphold summary judgment for the sellers on that score. *See, e.g.*, Appellees' Brief at 41 ("Appellees admittedly did not arrange for Nick Sung to revisit the property * * * and provide the certification. However, it is also undisputed that [a]ppellees did nothing to prevent the completion of the basement work prior to closing, and in fact made substantial efforts after closing to have the contractor * * * complete the work")

{¶ 54} Any concern that Mr. Bechtel seeks basement repairs beyond the three fixes specified in the Sung report does not invalidate a claim by Mr. Bechtel as premised specifically on a contractual understanding regarding those particular repairs and the envisioned subsequent certification. *Compare* Appellees' Brief at 41 (characterizing Mr. Bechtel as now seeking "more extensive – and far more expensive – repairs"); *id.* at 38 ("any repairs to the basement were to be limited to the work set forth on the Nick Sung report"). The post-inspection remedy addendum was limited, for what is now relevant, to the specific fixes called for in the Nick Sung report. We uphold summary judgment for the Turners on all but that score.

**Conclusion**

{¶ 55} We sustain Mr. Bechtel's assignment of error only to the extent that it relates to his contract claim regarding the basement fixes identified in the Sung report. We overrule the assignment of error in all other respects. We affirm the trial court's grant of summary judgment to the Turners against Mr. Bechtel's claims except with regard to his

contract claim regarding those basement fixes, and we remand the case to the trial court for further proceedings as limited to that narrowed contract claim.

*Judgment affirmed in part and reversed in part; case remanded.*

SADLER, P.J., and BROWN, J., concur.

————————————